## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW HAMPSHIRE

**FEDERAL TRADE COMMISSION,**

                       **Plaintiff,**

    **v.**

**ODYSSEUS MARKETING, INC.,**
**and WALTER RINES,**

                       **Defendants.**

**Case No.  05-CV-330-SM**

## MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR AN ORDER HOLDING WALTER RINES, ONLINE TURBO MERCHANT, INC., AND SANFORD WALLACE IN CIVIL CONTEMPT FOR THEIR VIOLATIONS OF THIS COURT'S PERMANENT INJUNCTION

# CONTENTS

I.  **Introduction** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.  **Statement of Facts** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    A.    The Underlying Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    B.    The Contempt Defendants' Online Advertising Scheme . . . . . . . . . . . . . . . . . . 4

        1.    The Contempt Defendants' Phishing Tactics . . . . . . . . . . . . . . . . . . . . 6

        2.    The Contempt Defendants' Pagejacking and Mousetrapping Tactics . . . 9

        3.    The Organization and Results of the Contempt Defendants' Scheme . . 11

III.  **Legal Argument** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

    A.    The Contempt Defendants Had Notice of the Permanent Injunction . . . . . . . . 16

    B.    The Contempt Defendants Violated the Permanent Injunction . . . . . . . . . . . . . 18

        1.    The Contempt Defendants Distributed Content Without
Obtaining Computer Users' Express Consent, in
Violation of Permanent Injunction ¶ II.A . . . . . . . . . . . . . . . . . . . . . . 18

        2.    The Contempt Defendants Distributed Content that Redirects
Computer Users to Different Websites than those the Users
Chose to Visit, in Violation of Permanent Injunction ¶ II.B.1 . . . . . . . 21

        3.    The Contempt Defendants Distributed Content that Modifies
or Replaces the Functions of a Computer Application,
in Violation of Permanent Injunction ¶ II.B.2 . . . . . . . . . . . . . . . . . . . 22

        4.    The Contempt Defendants Obtained Users' Personally Identifiable
Information Without Obtaining Users' Express Consent,
in Violation of Permanent Injunction ¶ IV.A . . . . . . . . . . . . . . . . . . . . 22

        5.    Defendant Rines Failed to Procure a $500,000 Performance Bond
in Violation of Permanent Injunction ¶ IX . . . . . . . . . . . . . . . . . . . . . . 24

    C.    The Contempt Defendants Should Be Ordered to Disgorge
the Proceeds of their Online Advertising Scheme . . . . . . . . . . . . . . . . . . . . . . 25

    D.    The Court May Enter the Proposed Contempt Order Based on the
Declarations, Testimony, and Documentary Evidence if the Contempt
Defendants Fail to Raise A Genuine Issue Of Material Fact . . . . . . . . . . . . . . 27

IV.  **Conclusion** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

I.     **Introduction**

The Federal Trade Commission ("FTC" or "Commission") respectfully submits this

memorandum in support of its motion for an order holding defendant Walter Rines ("Rines"),

his firm, Online Turbo Merchant, Inc. ("OTM"), and his business partner, Sanford Wallace

("Wallace") (collectively, "contempt defendants"), in civil contempt for violating the Stipulated

Final Order for Permanent Injunction ("Permanent Injunction" or "Order") entered by this Court

on October 24, 2006.  The contempt defendants repeatedly violated this Court's Permanent

Injunction by downloading computer code to MySpace users without their consent, "pagejacking"

or redirecting those users to websites that barrage them with advertisements, "mousetrapping" or

hindering those users from departing those websites to subject them to more advertisements, and

"phishing" for or otherwise capturing users' personal information without their consent.

The Commission originally brought this case in 2005 to halt defendant Rines' deceptive

or unfair online advertising practices.  Rines' challenged practices included, but were not limited

to, the surreptitious downloading of "spyware" to consumers' computers that caused the display

of advertisements, interfered with the normal operation of consumers' web browsers, and

captured consumers' personal information without their consent.  The parties resolved the case

by stipulating to this Court's Permanent Injunction, which binds defendant Rines and those

acting in concert with him who have actual notice of the Order.

As detailed below, defendant Rines and his cohorts wasted little time in violating the

Court's Order.  Less than a month after the Court entered its Permanent Injunction in late 2006,

defendant Rines and his firm, contempt defendant OTM, began collaborating with contempt

defendant Wallace, a Las Vegas-based marketer with his own history of fraud, in a new online

advertising scheme.  In this scheme, Rines, Wallace, and OTM employed phishing, pagejacking,

1

and mousetrapping tactics to drive Internet users from the popular social networking website MySpace.com ("MySpace") to websites owned or affiliated with the contempt defendants that subjected visitors to numerous online advertisements (the contempt defendants' "advertising websites"). The contempt defendants' abusive tactics enabled them to garner at least half a million dollars. However, their tactics also prompted hundreds of consumer complaints, a lawsuit by MySpace, Inc., and the entry of a preliminary injunction against Rines and Wallace by the U.S. District Court for the Central District of California.

In the course of their online advertising scheme, the contempt defendants repeatedly violated specific provisions of this Court's Permanent Injunction by: (1) distributing online content (or "code") to MySpace users' computers without first obtaining those users' express consent; (2) redirecting users to websites other than those they chose to visit, specifically, the contempt defendants' advertising websites; (3) modifying the functions of users' web browser navigation controls, which hindered users from departing the contempt defendants' advertising websites; and (4) obtaining users' personal information without first obtaining those users' express consent. Moreover, defendant Rines further violated the Permanent Injunction by failing to procure a $500,000 performance bond before participating or assisting in the downloading of content that causes the display of advertisements, among other things.

As discussed further below, the Permanent Injunction entered against defendant Rines binds contempt defendants Wallace and OTM under Federal Rule of Civil Procedure 65(d)(2) because Wallace and OTM received actual notice of the Order and participated with Rines in violating its provisions. Accordingly, in view of the contempt defendants' order violations, the Commission respectfully requests the entry of a civil contempt order against Rines, Wallace, and OTM, and the disgorgement of the proceeds of their contumacious online advertising scheme.

II.     **Statement of Facts**

A.      **The Underlying Case**

On September 21, 2005, the Commission filed a complaint against defendant Rines and his now-defunct firm, Odysseus Marketing, Inc., charging them with violating Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), in the advertising and distribution of software programs.  As subsequently amended, the FTC's complaint charged that the defendants engaged in deceptive or unfair practices by surreptitiously downloading "spyware" programs to consumers' computers that, among other things, displayed pop-up and other online advertisements, modified web browser search results, and installed third-party advertising and other programs without notice to consumers.  PX01, Am. Compl. at 3-7, 11-13 (Docket #16-1) (exhibits omitted).  Among other things, the Commission charged that the defendants' programs captured consumers' personal information, including their names and their email addresses, without their consent.  *Id.* at 7.

After the filing of the amended complaint, this Court entered a stipulated Preliminary Injunction, finding that the defendants had likely engaged in the alleged violations and that the FTC was likely to prevail in its law enforcement action against defendant Rines.  PX02, Mod. Stip. Prelim. Inj. at 1 ¶ 3 (Docket #22).  Thereafter, Rines negotiated a settlement with the Commission through his counsel and agreed to the imposition of a monetary judgment and Permanent Injunction, which the Court entered on October 24, 2006.  PX03, Stip. Final Order for Perm. Inj. and Settlement of Claims for Monetary Relief ("Perm. Inj.") (Docket #26).

The Court's Order includes a judgment of $1,750,000, which was suspended upon payment of $10,000, due to the defendants' sworn inability to pay.  The Order also includes clear and specific injunctive provisions requiring Rines, and those acting in concert with him who have actual notice of the Order, to obtain consumers' express consent in advance before

3

distributing content that either displays advertisements on their computers or collects their personal information.  The Permanent Injunction also prohibits Rines and his cohorts from distributing content that redirects consumers' Internet web browsers to websites other than those the consumers choose to visit.  As detailed further below, defendant Rines and his cohorts repeatedly violated these and numerous other provisions of the Permanent Injunction in the course of implementing an online advertising scheme.

### B.     The Contempt Defendants' Online Advertising Scheme

In October 2006, the same month that the Court entered its Permanent Injunction, defendant Rines and his firm, contempt defendant OTM,[1] embarked on an online advertising scheme with contempt defendant Wallace.  PX22, Rines Dep. at 36:13-25; PX29, Wallace Dep. at 53:18-54:7, 81:5-83:16.  Wallace is a marketer with a history of fraudulent and abusive practices in the field of online advertising.[2]  Wallace and Rines have worked together in the past.

---

[1]     Defendant Rines is the sole owner, director, and officer of OTM, a New Hampshire corporation.  PX33, N.H. Sec'y of State Corp. Records for Online Turbo Merchant, Inc. at 4; PX22, Rines Dep. at 30:16-20.  OTM's last reported business address is Rines' home address.  *Compare* PX33 at 4 *with* PX22, Rines Dep. at 14:5.  OTM is not in good standing with the New Hampshire Secretary of State.  *See, e.g.*, PX33 at 5.

[2]     The FTC previously sued Wallace in this district for violating the FTC Act in placing spyware programs onto consumers' computers and marketing fraudulent "anti-spyware" programs.  In March 2006, U.S. District Judge Joseph A. DiClerico, Jr. entered a default judgment and permanent injunction against Wallace that, among other things, includes a $4 million judgment and bars Wallace from downloading spyware programs to consumers' computers or redirecting consumers to websites other than those consumers elect to visit.  PX31, *FTC v. Seismic Entm't Prods., Inc., et al.*, No. 1:04CV377-JD (D.N.H. entered Mar. 22, 2006).

In addition to the FTC's previous suit, Wallace and/or his firm, Cyber Promotions, Inc., have been repeatedly sued and held responsible for engaging in the widespread dissemination of unsolicited commercial emails, colloquially known as "spamming."  *See, e.g.*, *CompuServe, Inc. v. Cyber Promotions, Inc.*, 962 F. Supp. 1015 (S.D. Ohio 1997); *Cyber Promotions Inc. v. America Online, Inc.*, 948 F. Supp. 436 (E.D. Pa. 1996); *see also Concentric Network Corp. v. Wallace*, No. C-96-20829 (N.D. Cal. Nov. 13, 1996) (consent order), *available at* http://legal.web.aol.com/decisions/dljunk/concen.html.

PX22, Rines Dep. at 34:8-36:12.

Wallace and Rines' scheme specifically targeted consumers who are users of the Internet website, MySpace. MySpace is a popular social networking website that permits users to create unique personal profiles to communicate with other persons online. It is reported to be the most-visited website in the United States. PX07, Kaleel Decl. at 1 ¶ 2. MySpace provides users the ability to send and receive email to and from other MySpace users, to post public "comments" on other users' profiles, to delete comments posted on their own profiles, and to participate in online "groups." *Id.* at 1 ¶ 3.[3] The contempt defendants used MySpace's email, comments, and groups features to distribute computer code and other content described below to MySpace users. *E.g.*, PX07, Kaleel Decl. at 4-5 ¶¶ 16-20; PX08, Wiley Decl. at 2-3 ¶¶ 3-8.

The crux of the contempt defendants' scheme was to redirect MySpace users from the MySpace website to the contempt defendants' "advertising websites," which subjected users to numerous online advertisements. The advertising websites, including one of Wallace's websites, freevegasclubs.com, displayed numerous advertisements for third-party vendors offering goods or services, including telephone ring tones and sexually explicit, adult-oriented dating services.[4]

---

[3]      A person must register as a member and create a user profile to obtain and use an email account on MySpace. To create a user profile, a person must create a confidential password and provide certain personal information, including his or her name, birth date, and email address. *Id.* at 1 ¶ 4. Each user profile contains a "comments" section in which a user's friends may leave comments for all viewers to read. MySpace users have the option to delete any comment. *Id.* at 2 ¶ 7. MySpace's "groups" feature allows a group of users to share a common web page and an online message board. *Id.* at 2 ¶ 10. When users utilize the MySpace website to read or send emails and comments or participate in groups, they are accessing computer servers located in California that allow them to receive content from other users and distribute content to other users. *See id.* at 2 ¶ 9.

[4]      PX22, Rines Dep. at 36:13-37:18; PX29, Wallace Dep. at 53:18-54:7, 75:24-77:8, 81:5-83:16 (testimony of contempt defendant Wallace, admitting that he "work[ed] with [defendant Rines] on MySpace related activities" in a "collaborative effort" to "direct[]

5

As detailed in the following sub-sections, the contempt defendants implemented their scheme by targeting MySpace users with abusive tactics known as "phishing," "pagejacking," and "mousetrapping," respectively, to capture MySpace users' personal information, to redirect users to the contempt defendants' advertising websites, and to modify the navigational controls of users' web browsers, hindering them from departing the advertising websites. Each of these tactics entailed the distribution of online content to MySpace users without their express consent. Moreover, as discussed further below, each of these tactics blatantly violated this Court's Order.

### 1.    The Contempt Defendants' Phishing Tactics

In the course of their scheme, the contempt defendants acquired MySpace users' personal information, including their email addresses and MySpace account login information, by targeting them with "phishing" exploits—electronic messages or webpages seeking personal information that deceptively appeared to have been sent by users' friends, or by MySpace, Inc., rather than the contempt defendants.[5]  After acquiring users' personal information, the contempt defendants used that information to log into users' MySpace accounts and send messages from

---

MySpace users to various websites including [f]reevegasclubs.com and [r]ealvegassins.com"); *see also id.* at 86:1-4, 190:18-25; PX10, Frazier Decl. at 1-6 ¶¶ 5-8 (describing contempt defendants' scheme and depicting various online advertisements).

The exhibits accompanying this filing depict examples of the advertising websites to which the contempt defendants redirected MySpace users.  PX10, Frazier Decl. at 2 ¶ 5, 6 ¶ 8; PX12, Printout of Advertising Webpages (webdate.com, freevegasclubs.com); PX16, Printouts of Linked Advertising Webpages at 4-7 (freevegasclubs.com, real-vegas-sins.com); PX21, Shing Decl. at 4-7 (depicting additional pages from advertising websites registered by, or affiliated with, the contempt defendants).

[5]    The Oxford English Dictionary defines the verb, "phish," in pertinent part, as follows:  "To perpetrate a fraud on the Internet in order to glean personal information from individuals, esp. by impersonating a reputable company; to engage in online fraud by deceptively 'angling' for personal information."  Oxford English Dictionary, Online Edition, http://dictionary.oed.com/cgi/entry/30004303.

those users' accounts to additional users, directing those users to the advertising websites. PX29, Wallace Dep. at 87:6-10, 98:11-19; PX22, Rines Dep. at 79:24-80:1; PX08, Wiley Decl. at 3-4 ¶¶ 7-8; PX10, Frazier Decl. at 1-4 ¶¶ 7-8.

In one phishing exploit, the contempt defendants sent emails and posted comments on MySpace users' profiles, inviting those users to click on a hypertext link, which, when clicked, opened a webpage enticing users to complete a form describing their physical characteristics to generate an electronic "sketch" of themselves.  PX10, Frazier Decl. at 1-2 ¶ 5.  Although this webpage resided on one of the contempt defendants' websites, the page prominently featured MySpace's logo and trademark, fostering the misleading impression that the page was sponsored by, or was a part of, MySpace.  PX11, Printout of Contempt Defendants' "Sketch Page"; PX10, Frazier Decl. at 2 ¶ 5.  The sketch page invited users to forward their sketch to other users by entering their MySpace login information, including their email addresses, into an online form. PX10, Frazier Decl. at 1-2 ¶ 5.  However, users who completed this form were not actually verifying their login credentials with MySpace; rather, they were handing over their login information to the contempt defendants.  PX29, Wallace Dep. at 87:6-10.  Additionally, users who tried to leave these pages using their web browser navigational controls were, instead, redirected automatically to the contempt defendants' advertising websites.  *Id.*; PX10, Frazier Decl. at 1-2  ¶ 5; *see generally id.* at 2 ¶ 5, 6 ¶ 8; PX12; PX16 at 4-7; PX21, Shing Decl. at 4-7 (depicting examples of advertising websites).

In another phishing exploit, orchestrated to coincide with the Easter holiday, automated means were used to access at least 328,303 MySpace user accounts without authorization and to send at least 392,726 unsolicited messages promoting an online holiday card ("eCard") for Easter.  PX10, Frazier Decl. at 2-3 ¶ 7; PX13, Easter Holiday eCard Messages; PX29, Wallace

Dep. at 93:16-18; 124:14-22.  This Easter eCard resided on one of the contempt defendants'

websites.  PX10, Frazier Decl. at 3 ¶ 7.  When opened, the Easter eCard invited MySpace users

to "forward" the card to a friend—by typing their MySpace account login information into an

online form that closely resembled the MySpace login page.  PX10, Frazier Decl. at 3 ¶ 7; PX14,

Easter eCard Default View.  As before, users who completed this form handed over their email

addresses and login information to the contempt defendants, while users who tried to leave the

eCard were, instead, redirected automatically to the contempt defendants' advertising websites.

PX29, Wallace Dep. at 98:11-19; *see* PX22, Rines Dep. at 79:24-80:1.

   The contempt defendants deployed similar "eCards" at other times.  *See* PX28, Christmas

eCard at 1; PX22, Rines Dep. at 83:18-84:9.  In their eCards, the contempt defendants included

an inconspicuous statement that purported to disclaim any affiliation between the eCards and

MySpace, Inc., and sought to authorize the card's unidentified creators to utilize users' MySpace

accounts "to spread the word about this funny site" and "introduce new entertaining sites."[6]

However, this so-called "terms of use" statement was *not* visible to users unless they scrolled

---

   [6]      *See* PX15, Easter Holiday eCard, Two-Page View.  This "terms of use" statement
further purported to advise users, in pertinent part:

   By filling out this form, you authorize us to spread the word about this funny site.
   You will enjoy your friends' reactions and you will receive all the credit.  This is a
   harmless e-card site looking to spread the laughter!
   . . . .
   We may do a combination of the following based on your friends' interest.
   1.  Temporarily access your MySpace account for the following purpose(s).
   2.  Post bulletins about this site in the appropriate section.
   3.  Invite your friends to a 'group' referencing this site.
   4.  Invite your friends to an 'event' referencing this site.
   5.  Comment your top friends about this site.
   6.  Send messages on your behalf about this site.
   7.  Create a small floating profile overlay (very cool!).
   8.  Introduce new entertaining sites.

down below the holiday eCard, or clicked on the word "terms" appearing in a line of fine print ("By submitting this form you agree to the <u>terms</u> below") tucked beneath a button labeled, "Send to Friends."  *See* PX15, Easter Holiday eCard, Two-Page View; PX10, Frazier Decl. at 3 ¶ 7 (discussing inconspicuous placement of "terms of use" statement).  Moreover, the contempt defendants' eCards did not require users to review and acknowledge the "terms of use" before handing over their email address and login information to the contempt defendants.  *See id.* Additionally, the "terms of use" statement did not advise MySpace users that the contempt defendants would redirect users' web browsers to advertising websites, or disable users' web browser controls and barrage them with advertisements, as discussed below.

MySpace, Inc. received many complaints from users regarding the contempt defendants' numerous phishing messages.  *E.g.*, PX07, Kaleel Decl. at 3 ¶ 15; PX10, Frazier Decl. at 8 ¶ 15; PX20, Examples of Consumer Complaints, at 1-6, 8-12, 14-20, 24-30, 33, 35-36, 38-39, 45, 51.[7]

### 2.     The Contempt Defendants' Pagejacking and Mousetrapping Tactics

In the course of their online advertising scheme, the contempt defendants also employed "pagejacking" and "mousetrapping" tactics to redirect MySpace users to the advertising websites and then hinder users from departing those websites.

---

[7]      Upon investigating these complaints, MySpace, Inc. discovered that the contempt defendants used additional phishing ploys to acquire users' personal information and redirect those users to the advertising websites.  PX10, Frazier Decl. at 2 ¶ 6, 3-6 ¶ 8 (describing other phishing exploits).

In its investigation, MySpace, Inc. also found that contempt defendant Wallace used automated means to access over 300,000 MySpace user accounts without authorization and post at least 890,000 comments on user profiles with links to the advertising websites.  *Id.* at 8 ¶ 13. These comments included computer code that hampered users from deleting the comments.  *Id.* Additionally, in Fall 2007, MySpace found evidence that defendant Rines or others acting on his behalf engaged in similar conduct, using phished user accounts to drive traffic to websites registered to Rines.  PX21, Shing Decl. at 3-8 ¶¶ 7-8.

**Pagejacking.**  In their scheme, the contempt defendants drove MySpace users to their advertising websites through the use of pagejacking computer code—hidden code that redirected Internet users, without their consent, from webpages that they chose to visit, to webpages that they did not choose to visit.  The contempt defendants distributed this code to users through at least two channels—the contempt defendants' phishing webpages, and MySpace itself.

First, as previously noted, when MySpace users tried to depart the contempt defendants' phishing webpages, including but not limited to the "sketch" or "eCard" pages described above, the contempt defendants automatically redirected or pagejacked those users to their advertising websites.  PX10, Frazier Decl. at 1-2 ¶ 5; PX29, Wallace Dep. at 87:6-10, 98:11-19; *see* PX22, Rines Dep. at 79:24-80:1.  The contempt defendants redirected these users by including code in the phishing webpages that was triggered when users attempted to leave those pages.  *E.g.*, PX10, Frazier Decl. at 7-8 ¶¶ 11-14; PX21, Shing Decl. at 3-12 ¶¶ 7-9, 13-15.

Second, when MySpace users visited various user profiles or groups on the MySpace website itself, the contempt defendants redirected or pagejacked those users to the advertising websites as well.  The contempt defendants redirected those users by adding code, in the form of images known as "overlays," to cover the contents of numerous MySpace profiles and groups.  These overlays, such as a picture of a mountain range that completely covered a user's profile, or a smeared image that obscured a user's picture on his profile, contained hidden pagejacking code.  PX10, Frazier Decl. at 7 ¶ 11-12; PX17, Printout of Mountain Range Overlay; PX18, Printout of User Profile Overlay.  When visitors clicked on these overlays, they were automatically redirected to the advertising websites.  PX10, Frazier Decl. at 7 ¶ 11; PX21, Shing Decl. at 2 ¶ 3, 10 ¶ 13.

MySpace, Inc. received numerous complaints regarding the contempt defendants' pagejacking tactics.  PX10, Frazier Decl. at 8 ¶ 15; PX20, Examples of Consumer Complaints, at 26, 31-32, 40-41, 50, 53, 55-60, 65-68.

**Mousetrapping.**  Finally, after the contempt defendants redirected MySpace users to their advertising websites, they employed mousetrapping tactics to keep users on those websites. Specifically, the contempt defendants used mousetrapping code on their advertising websites. This code modified and disabled the navigational controls of users' web browsers, hindering users' efforts to depart the advertising websites.  When users tried to depart those websites by clicking their web browsers' "back," "cancel," or "exit" buttons, they found that these controls were disabled.  Moreover, when users tried to use such controls, they found that the advertising websites subjected them to additional advertisements.  *E.g.*, PX10, Frazier Decl. at 1-6 ¶¶ 5-8; PX21, Shing Decl. at 8 ¶ 7.  MySpace, Inc. received numerous complaints regarding the contempt defendants' mousetrapping tactics as well.  PX10, Frazier Decl. at 8 ¶ 15; PX20, Examples of Consumer Complaints, at 21-23, 38, 43, 46-47, 54.[8]

### 3.    The Organization and Results of the Contempt Defendants' Scheme

Rines, Wallace, and OTM each actively participated in this online advertising scheme and received substantial income from their scheme.  However, the contempt defendants' scheme

---

[8]    The contempt defendants' pagejacking and mousetrapping exploits were not the only instances in which the contempt defendants distributed online content to MySpace users without their consent.  The contempt defendants also sent content to MySpace users without their consent by sending them spam emails.  Most notably, MySpace technical personnel discovered that contempt defendant Wallace created over 11,000 "dummy" MySpace profiles to send large quantities of spam to other users.  PX07 at 4-5 ¶¶ 18-20.  Wallace admitted creating and using these profiles.  PX29, Wallace Dep. at 102:6-25; 103:15-23.  Moreover, in the course of the contempt defendants' scheme, Wallace also gained access to MySpace users' accounts and sent at least 6,000 spam emails from those users' accounts.  PX08, Wiley Decl. at 2 ¶ 7; *see also id.* at 2-3 ¶ 8.

also triggered a substantial volume of consumer complaints, a lawsuit by MySpace, Inc., and the imposition of a preliminary injunction against the contempt defendants by another federal court.

Defendant Rines and contempt defendant Wallace collaborated in redirecting users from MySpace to the contempt defendants' advertising websites.  Indeed, Wallace admits that he "work[ed] with [Rines] on MySpace related activities" in a "collaborative effort" to "direct[] MySpace users to various websites including [f]reevegasclubs.com and [r]ealvegassins.com." PX29, Wallace Dep. at 53:18-54:5, 75:24-77:8, 81:21-83:16.  Specifically, Rines provided Wallace with computing resources to redirect MySpace users, using his firm, OTM, to lease computer servers that he "provided to Sanford Wallace for his use in generating web traffic to the freevegasclubs.com web site."[9]  Utilizing the servers provided by Rines and OTM, Wallace employed MySpace's email, comments, and groups features to redirect MySpace users to the advertising websites.  PX07, Kaleel Decl. at 4-5 ¶¶ 16-20; PX08, Wiley Decl. at 2-3 ¶¶ 3-8; PX22, Rines Dep. at 54:16-55:2 (acknowledging that Wallace "generally gets users that are MySpace users" to the advertising websites); *see also id.* at 93:14-21.  Significantly, defendant Rines also personally participated in directing MySpace users to the advertising websites by creating MySpace user profiles and groups to direct users to websites such as freevegasclubs.com. PX29, Wallace Dep. at 76:6-77:12; *see* PX21, Shing Decl. at 3 ¶ 7, 8 ¶ 8, 10 ¶¶ 11, 13.

Additionally, defendant Rines played a managerial role in the contempt defendants' scheme.  He personally managed the advertisements on the principal advertising website owned

---

[9]      PX24, Rines Rep. at 2:24-25 (written report of defendant Rines); PX22, Rines Dep. at 29:2-22 (authenticating written report and attesting to veracity of statements in report). Defendant Rines also admitted "maintaining a group of servers at ISP Servint.com that he has made available to Sanford Wallace at Mr. Wallace's disposal in order to generate Internet traffic for the freevegasclubs.com web site."  PX24, Rines Rep. at 2:10-13.

by contempt defendant Wallace, <u>freevegasclubs.com</u>.  PX22, Rines Dep. at 30:23-31:2, 32:2-18,

33:13-14; 36:13-25; *see also* PX29, Wallace Dep. at 76:19-77:8, 83:5-16.  Through his firm,

OTM, Rines entered into agreements with online advertising networks, selected advertisements

to display on <u>freevegasclubs.com</u>, and monitored the performance of those ads.  PX22, Rines

Dep. at 30:23-31:6, 32:2-18.  Additionally, through OTM, Rines collected payments from online

advertising networks, evenly splitting the proceeds with Wallace.[10]

Together, the contempt defendants obtained a substantial sum of money—at least

$555,850.04—in their scheme.  PX32, Burton Decl. at 3 ¶ 11; PX25, Rines' Fin. Spreadsheet;

*see* PX22, Rines Dep. at 31:12-13, 37:3-18 (admitting that contempt defendants split income);

PX29, Wallace Dep. at 88:13-17 (same).  This figure represents the total amount of income

received by contempt defendant OTM from online advertising networks in connection with the

contempt defendants' online advertising activities, as personally recorded by defendant Rines in

a financial spreadsheet, for the limited time period of November 21, 2006 to May 18, 2007.[11]

However, this substantial figure likely understates the cumulative amount of the contempt

defendants' financial gain, because the contempt defendants continued their scheme beyond the

closing date of defendant Rines' spreadsheet, May 18, 2007.  PX22, Rines Dep. at 32:2-33:14

---

[10]     *Id.* at 31:12-13, 37:3-18; PX29, Wallace Dep. at 88:13-17.  Acting for various
merchants, online advertising networks paid the contempt defendants for their advertising based
on performance measures such as clicks on banner ads, leads, sales, or registrations attributed to
their activities.  PX22, Rines Dep. at 38:22-39:16, 114:5-20.

[11]     For the time period indicated above, defendant Rines recorded the daily income
of the contempt defendants' online advertising scheme in a financial spreadsheet filed with the
Court in conventional, hard copy format as exhibit PX25.  *See* PX25, Fin. Spreadsheet at 1:35,
264:4226; PX22, Rines Dep. at 41:10-53:7 (authenticating and describing contents of financial
spreadsheet); PX24, Rines Rep. at 1 ¶ 2 (same); *see also* PX32, Burton Decl. at 3 ¶¶ 10-12
(summarizing income reported in voluminous spreadsheet).

(acknowledging continued operation of advertising scheme in June 2007); PX21, Shing Decl. at 3-11 ¶¶ 6-14 (reporting contempt defendants' phishing, pagejacking, and mousetrapping exploits in August 2007 and thereafter).

The contempt defendants' scheme not only enabled them to obtain a substantial amount of money, it also resulted in a substantial number of consumer complaints.  MySpace, Inc. received literally hundreds of complaints from users concerning the contempt defendants' abusive tactics.  PX10, Frazier Decl. at 8 ¶ 15 (reporting receipt of over 800 consumer complaints); *see* PX 20, Examples of Consumer Complaints.

Additionally, the contempt defendants' scheme also prompted legal action by MySpace, Inc., resulting in the imposition of a preliminary injunction against the contempt defendants. Last year, MySpace, Inc. initially sued contempt defendant Wallace in the U.S. District Court for the Central District of California, seeking injunctive and other relief for his violations of federal and state laws, including the federal CAN-SPAM Act, 15 U.S.C. § 7701 *et seq.*, in connection with the contempt defedants' online advertising scheme.[12]  The court subsequently entered a preliminary injunction, enjoining Wallace from using MySpace user profiles, accessing the MySpace website to send messages, or using MySpace for a commercial purpose, among other things.  *MySpace, Inc. v. Wallace*, 498  F. Supp. 2d 1293 (C.D. Cal. 2007); PX04, Prelim. Inj. with Findings of Fact and Concls. of Law, *MySpace, Inc. v. Wallace*, 07-CV-1929 (C.D. Cal.

---

[12]     Among other things, MySpace, Inc. alleged that the contempt defendants redirected MySpace users to their advertising websites with deceptive means, hindered users from departing those websites, and deceived users into divulging their personal information, including login information, and used that information to wrongfully access MySpace accounts and to send spam promoting the advertising websites through victims' MySpace accounts. PX05, Am. Compl., *MySpace, Inc. v. Wallace et al.*, 07-CV-1929 ¶¶ 18-19, 21, 24-27 (C.D. Cal. filed Sept. 26, 2007).

14

entered July 20, 2007).  Thereafter, the court amended its injunction to expressly name defendant

Rines as a bound party, after MySpace, Inc. amended its complaint and presented evidence that

Rines had continued to implement the contempt defendants' scheme.  *See* PX06, Order Granting

Mot. to Modify Prelim. Inj., *MySpace, Inc. v. Wallace, et al.*, 07-CV- 1929 (C.D. Cal. entered

Oct. 15, 2007); PX21, Shing Decl. at 1.  MySpace, Inc.'s lawsuit is still pending.

## III.    Legal Argument

With the motion accompanying this memorandum, the Commission respectfully requests

that this Court enforce its Permanent Injunction by holding defendant Rines and his cohorts,

Wallace and OTM, in civil contempt.

District courts have the inherent power to enforce their orders.  *Shillitani v. United States*,

384 US. 364, 370 (1966).  As a party to the original action, the plaintiff may invoke the court's

power by initiating a proceeding for civil contempt in the same action.  *Gompers v. Bucks Stove*

*& Range Co.*, 221 U.S. 418, 444-45 (1911).  The plaintiff can establish liability for civil contempt

by showing by clear and convincing evidence that the contempt defendants have violated a clear

and unambiguous order.  *Project B.A.S.I.C. v. Kemp*, 947 F.2d 11, 16 (1st Cir. 1991).  Once the

plaintiff makes this showing, the burden then shifts to the contempt defendants to demonstrate

that they were unable to comply with the order.  *See, e.g.*, *United States v. Rylander*, 460 U.S.

752, 757 (1983); *see also FTC v. Affordable Media, LLC*, 179 F.3d 1228, 1239 (9th Cir. 1999).[13]

The contempt defendants cannot raise a defense that they did not intentionally violate the order.

---

[13]        "The burden of proving impossibility falls on [the alleged contemnors] and
that burden is difficult to meet."  *Dystar Corp. v. Canto*, 1 F. Supp. 2d 48, 55 (D. Mass. 1997).
"[S]elf-induced inability . . . does not meet the test."  *In re Power Recovery Sys., Inc.*, 950 F.2d
798, 803 (1st Cir. 1991).  Indeed, in *Power Recovery*, the First Circuit affirmed a contempt
finding against a contemnor who failed to comply with a court order to remove his equipment
from another's property, even though the contemnor had since sold the equipment.  *Id.*

"The law is firmly established in this circuit that good faith is not a defense to civil contempt."

*Goya Foods*, *Inc. v. Wallack Mgmt. Co.*, 290 F.3d 63, 76 (1st Cir. 2002).

As discussed below, the contempt defendants should be held in civil contempt and should be ordered to disgorge the proceeds of their scheme because they had notice of the Court's Permanent Injunction and violated numerous, specific provisions of that Order.

**A.     The Contempt Defendants Had Notice of the Permanent Injunction.**

The Court's Permanent Injunction binds contempt defendants Rines, Wallace, and OTM because they received actual notice of the Order.  It is well-settled that a court's contempt power extends not only to the named parties, but also to non-parties who have notice of a court's order and the responsibility to comply with it.  "Nonparties may be liable for civil contempt notwithstanding their nonparty status." *Goya Foods*, 290 F.3d at 75.  "[D]efendants may not nullify a decree by carrying out prohibited acts through aiders and abettors, although they were not parties to the original proceeding."  *Regal Knitwear Co. v. NLRB*, 324 U.S. 9, 14 (1945). As the First Circuit has stated, "it has long been recognized that a nonparty may be held in civil contempt if, and to the extent that, [the non-party] knowingly aids or abets an enjoined party in transgressing a court order."  *Goya Foods*, 290 F.3d at 75 (citing *Gemco Latinoamérica, Inc. v. Seiko Time Corp.*, 61 F.3d 94, 98 (1st Cir. 1995)).  Hence, Federal Rule of Civil Procedure 65(d) provides, in pertinent part, that injunctions are binding on the parties to the action and "other persons who are in active concert or participation with [them]" if they "receive *actual notice* of [the order] by personal service or otherwise."  FED. R. CIV. P. 65(d)(2) (emphasis added).

Actual notice is knowledge of an order's existence, not of its exact terms.  *See, e.g.*, *Goya Foods*, 290 F.3d at 75 ("a nonparty must know of the judicial decree"); *Perfect Fit Indus., Inc. v. Acme Quilting Co.*, 646 F.2d 800, 808 (2d Cir. 1981); *FTC v. Neiswonger*, 494 F. Supp. 2d 1067,

16

1079 (E.D. Mo. 2007) ("All that is required is knowledge of the mere existence of the injunction; not its precise terms.").  Personal service of the order is not required.  FED. R. CIV. P. 65(d)(2) (referring to notice "by personal service or otherwise"); *Neiswonger*, 494 F. Supp. 2d at 1079.

In this case, there is clear and convincing evidence that each of the contempt defendants received actual notice of the Permanent Injunction.  Defendant Rines negotiated the Permanent Injunction with the assistance of counsel, signed the proposed Order, and attested to receiving the Court's Order after its entry.  PX03, Perm. Inj. at 2 ¶ 8; *id.* at 27; PX22, Rines Dep. at 23-24; PX26, Rines Aff'd at 1-2.  Contempt defendant OTM received actual notice of the Permanent Injunction as a matter of law because its sole owner, director, and officer, defendant Rines, had actual notice.[14]  Finally, contempt defendant Wallace admitted at his deposition last April that he was aware of the Court's Order as to defendant Rines.  PX29, Wallace Dep. at 118:2-3 ("I also believe that Walt has a separate agreement with FTC . . . Mr. Rines – I know that he's under order at least I believe he is with the FTC."), 174:14-21 ("I do know [Rines] entered into a stipulated agreement and I did review [the] stipulated agreement back at the time"); *see also id.* at 53:18-25, 195:1-14.  Defendant Rines' testimony further confirms that Wallace had notice of Rines' Permanent Injunction.  PX22, Rines Dep. at 63:9-24 ("Q:  Have you given a copy of the Final Order to Sanford Wallace?  A:  . . . I believe he told me he looked it up online. . . .  I'm

---

[14]    As previously noted, Rines is OTM's sole owner, director, and officer.  PX33, N.H. Sec'y of State Corp. Records at 4; PX22, Rines Dep. at 30:16-20.  Consequently, OTM has notice of the Permanent Injunction.  *See Dinco v. Dylex Ltd.*, 111 F.3d 964, 972 (1st Cir. 1997) (observing that director's knowledge may be imputed to firm); *United States v. Bank of New England, N.A.*, 821 F.2d 844, 856 (1st Cir. 1987) ("knowledge obtained by corporate employees acting within the scope of their employment is imputed to the corporation"); *FTC v. Neiswonger*, 494 F. Supp. 2d at 1080 n.18 (imputing officers' knowledge of order to their company in FTC civil contempt action); *see also Cablevision Sys. Corp. v. Muneyyirci*, No. 90-2997, 1995 WL 362541 at *3 n.1 (E.D.N.Y. Aug. 24, 1990) (holding that firm "had actual notice . . . by virtue of the fact that the people controlling the corporation had actual knowledge of those orders").

sure he told me he has looked up my Order."). Accordingly, it is clear that the contempt defendants received actual notice of the Court's Permanent Injunction.

### B.    The Contempt Defendants Violated the Permanent Injunction.

The contempt defendants repeatedly violated this Court's Permanent Injunction in the course of their online advertising scheme by: (1) distributing code or other content to MySpace users without their express consent; (2) distributing pagejacking code that redirects users to different websites than those the users chose to visit; (3) distributing moustrapping code that modifies or replaces the functions of users' web browsers; and (4) obtaining users' personally identifiable information without those users' express consent. In addition, defendant Rines further violated the Order by failing to procure a $500,000 performance bond before participating in the display of online advertisements and related activities.

### 1.    The Contempt Defendants Distributed Content Without Obtaining Computer Users' Express Consent, in Violation of Permanent Injunction ¶ II.A.

The contempt defendants violated Paragraph II.A of the Permanent Injunction by distributing computer code and other content to MySpace users without their express consent. Paragraph II.A of the Permanent Injunction prohibits defendant Rines, and those, like Wallace and OTM, who act in concert with him and have actual notice of the Order, from distributing, installing, or downloading any content "*unless* users provide express consent as defined in th[e] Order prior to the distribution." PX03 at 9 ¶ II.A (emphasis in original).[15]

---

[15]    Paragraph II.A expressly enjoins "[d]istributing, installing, or downloading, or causing any user of a covered product to download and install, any software program, code, script, or any other content *unless* such user provides express consent as defined in this Order prior to the distribution, installation, or downloading." *Id.* (emphasis in original). The phrase "user of a covered product" includes computer users because the phrase "covered product" includes "any desktop or laptop computer." *Id.* at 3 ¶ 4.

The Court's Order sets forth detailed requirements for obtaining users' "express consent" to the distribution of computer code or other content.  Before distributing such content, the contempt defendants must disclose to users, in advance, the specific effects that their content would have on users' computers—including, but not limited to, whether the content would cause the display of any advertisement or any link to an ad placed on a website.  *Id.* at 7-8 ¶ 7.a.1.i.  This disclosure must be clear, conspicuous, and unavoidable; it cannot be buried or otherwise displayed in an end user license agreement.  *Id.* at 7 ¶ 7.a.1; *id.* at 5 ¶¶ 8.a, 8.d.  Moreover, the contempt defendants must obtain users' assent to the downloading of content, by having users either click a button clearly labeled to convey that it will activate a download or take some substantially similar action to authorize the download.  *Id.* at 4 ¶ 7.a.2.  Unfortunately, the contempt defendants disregarded these detailed, stipulated requirements in their scheme, distributing content to MySpace users without those users' express consent.

As previously detailed in Section II above, the contempt defendants distributed computer code and other content to thousands of MySpace users by sending users phishing messages, see *supra* pp. 6-9; disseminating pagejacking code in their phishing webpages and eCards as well as in MySpace profiles and groups, see *supra* pp. 9-11; surreptitiously employing mousetrapping code on their advertising websites downloaded to MySpace users, see *supra* p. 11; sending large quantities of unsolicited, "spam" emails and messages to MySpace users, see *supra* p. 11 n.8; and posting comments on MySpace user profiles promoting the advertising websites that included hidden code hampering the users' ability to delete the comments.  *See supra* p. 9 n.7.

The contempt defendants did not obtain MySpace users' prior, express consent to the distribution of any of this online content.  They did not clearly and conspicuously disclose to users, in advance, the effects that their code, webpages, and other content would have on users'

19

computers, such as redirecting users' web browsers to advertising websites, modifying and disabling the controls of users' web browser controls, or hindering users from deleting comments promoting the advertising websites. *See supra* pp. 8-9. Nor did the contempt defendants obtain users' advance assent to these effects by having them click a button clearly labeled to convey their consent or take some similar action. *See id.*

Although the contempt defendants provided a "terms of use" statement to some MySpace users—specifically, those users targeted with phishing exploits in the guise of holiday eCards— this statement was limited, misleading, inconspicuous, and patently insufficient to obtain users' express consent to the distribution of online content as required by the Order. First, the "terms of use" statement was very limited. It did not refer to the display of online advertisements, much less disclose the contempt defendants' uses of pagejacking and mousetrapping code to direct users to advertising websites and to keep them there. *See id.* Second, the "terms of use" statement was misleading. It invited MySpace users to authorize the use of their accounts "to spread the word about [a] funny site" and "introduce new entertaining sites." PX15, Easter Holiday eCard, Two-Page View ("By filling out this form, you authorize us to spread the word about this funny site. . . . This is a harmless e-card site looking to spread the laughter!"). Here, again, the contempt defendants did not clearly disclose that they would access users' MySpace accounts to send messages to other MySpace users and direct those users to advertisements. *See supra* pp. 8-9. Third, the "terms of use" statement was highly inconspicuous and avoidable. Indeed, it was not visible at all unless the user scrolled down or otherwise navigated to the bottom of the page, and users were not required to confirm that they reviewed the statement

20

before handing over their login information to the contempt defendants. *See id.*[16]  The contempt

defendants' "terms of use" statement hardly complied with the detailed requirements for express

consent agreed to and adopted in this Court's Order.  The contempt defendants clearly violated

Paragraph II.A of the Permanent Injunction by distributing content to MySpace users without

obtaining their express consent.

> **2.     The Contempt Defendants Distributed Content that Redirects
> Computer Users to Different Websites than those the Users Chose to
> Visit, in Violation of Permanent Injunction ¶ II.B.1.**

The contempt defendants also violated Paragraph II.B.1 of the Permanent Injunction.

This provision prohibits defendant Rines and those, like Wallace and OTM, who act in concert

with him and have actual notice of the Order, from distributing content that redirects users'

computers to different websites than those the users chose to visit.  PX03, Perm. Inj. at 9 ¶ II.B.1.

As highlighted above, the contempt defendants distributed code that pagejacked

MySpace users, redirecting them from Internet websites that they chose to visit, such as

MySpace user profiles, MySpace groups, or holiday eCards ostensibly sent by their friends, to

the contempt defendants' advertising websites.  *See supra* p. 10.  The contempt defendants'

pagejacking code automatically redirected users to the advertising websites when users activated

the code, either by clicking on MySpace profiles or groups covered with "overlay" images, or by

attempting to depart the contempt defendants' holiday eCards and other phishing webpages.  The

code did not ask users if they wanted to visit the advertising websites, it simply diverted them to

---

[16]     Moreover, the "terms of use" disclosure resembles an end-user license agreement
or boilerplate disclosure, which does not comply with the terms of the Permanent Injunction.
*See, e.g.*, PX03, Perm. Inj. at 5 ¶ 8.d ("In the case of any disclosure required for purposes of
obtaining express consent as defined in this Order, a disclosure made in any End User License
Agreement shall *not* constitute a clear and conspicuous disclosure.") (emphasis in original).

those websites.  *See id.*  Accordingly, the contempt defendants clearly redirected users' computers to different websites than those the users chose to visit, in violation of Paragraph II.B.1 of the Permanent Injunction.

> **3.    The Contempt Defendants Distributed Content that Modifies or Replaces the Functions of a Computer Application, in Violation of Permanent Injunction ¶ II.B.2.**

The contempt defendants also violated Paragraph II.B.2 of the Permanent Injunction, which prohibits defendant Rines and those, like Wallace and OTM, who act in concert with him and have actual notice of the Order, from distributing computer code or other content that modifies or replaces any application's functions.  PX03, Perm. Inj. at 9 ¶ II.B.2.[17]  As discussed in Section II above, the contempt defendants engaged in this prohibited practice by distributing code that mousetrapped computer users, modifying or disabling the navigational controls of their web browsers.  *See supra* p. 11.  This tactic interfered with the navigational function of the web browser application, hindering users from departing the advertising websites.  *See id.*  This tactic plainly modified or replaced a function of users' web browsers, thereby violating Paragraph II.B.2 of the Permanent Injunction.

> **4.    The Contempt Defendants Obtained Users' Personally Identifiable Information Without Obtaining Users' Express Consent, in Violation of Permanent Injunction ¶ IV.A.**

The Permanent Injunction prohibits defendant Rines and those, like Wallace and OTM, who act in concert with him and received actual notice of the Order, from "obtaining any

---

[17]    Paragraph II.B.2 expressly prohibits the distribution of code that "modifies or replaces any search engine's or other application's search results, search features, or functions." *Id.* ¶ II.B.2.  The provision expressly applies to any "application," which includes web browser applications.  The provision protects against the modification or replacement of any application's "functions," which includes the navigational functions of the web browser application.  *Id.*

personally identifiable information of any person *unless* that person provides express consent . . . prior to the taking and use of the information."  PX03, Perm. Inj. ¶ IV.A (emphasis in original). Despite this prohibition, the contempt defendants obtained MySpace users' personally identifiable information ("PII") without first obtaining those users' express consent.

The Permanent Injunction defines PII as identifiable information from or about an individual, including but not limited to a first and last name, an email address, or other online contact information.  To obtain users' "express consent" to the taking of any PII, the Order requires that the contempt defendants disclose, in advance, the specific information to be obtained and each specific use that will be made of the information.  The disclosure must be clear and conspicuous, and unavoidable.  Moreover, users must indicate their assent to the taking of their PII by clicking on a button that is labeled to convey "specific consent to the specific taking or use," or by taking "substantially similar affirmative action authorizing the taking and use of the information."  PX03, Perm. Inj. pp. 4-6.

As discussed in Section II above, the contempt defendants obtained users' PII in phishing exploits, using online forms that resembled the MySpace login form to cause users to disclose their email addresses and other personal information under the guise of forwarding "sketches" and eCards, or other online content, to other MySpace users. *See supra* pp. 6-9.

The contempt defendants failed to obtain MySpace users' express consent before taking those users' PII.  First, the contempt defendants did not comply with the order requirement that they disclose each specific use of users' information.  Their phishing websites and the limited "terms of use" statement in their eCards failed to disclose that the contempt defendants would utilize MySpace users' email addresses and accounts to send other users messages promoting advertising websites such as freevegasclubs.com.  The contempt defendants' "terms of use"

23

statement merely advised users that they would "[i]ntroduce new entertaining sites."  *See supra* p. 8.  Second, the contempt defendants' statement regarding how they would utilize users' PII was highly inconspicuous and avoidable; as previously noted, their "terms of use" statement was not visible unless the user clicked on a link or scrolled down below the online form to the bottom of the page, and users could input and transmit their personal information without reviewing and acknowledging the terms.  *See supra* pp. 8-9.  Third, the contempt defendants failed to obtain users' "specific consent to the specific taking and use of the information," PX03, Perm. Inj. at 5 ¶ 7.b.3, through the use of a clearly labeled button or some similar device.  Instead, they enticed users to hand over their PII by clicking an uninformative button labeled, "Send to Friends."  *See supra* p. 9.  Although this button was adjacent to a line of fine print linked to their "terms of use" statement, the contempt defendants utterly failed to disclose anywhere in their eCards that they would utilize users' PII  to direct other users to advertisements.  *See supra* pp. 8-9. Accordingly, the contempt defendants clearly obtained users' PII without first obtaining their express consent to the taking and use of that information, in violation of Paragraph IV.A of the Court's Order.

### 5. Defendant Rines Failed to Procure a $500,000 Performance Bond in Violation of Permanent Injunction ¶ IX.

Lastly, defendant Rines violated Paragraph IX of the Permanent Injunction.  This provision requires Rines to secure a $500,000 performance bond, and to provide a copy of that bond to the Commission, before participating or assisting others in the downloading of code or other content that causes the display of an advertisement, modifies any web browser software, or collects any PII.  PX03, Perm Inj. at 13 ¶ IX.A, 14-15 ¶ IX.B.7.

Defendant Rines engaged in the specific activities for which the Permanent Injunction required him to secure a performance bond by participating and collaborating with contempt

defendant Wallace, as previously discussed, in downloading content to MySpace users that causes the display of advertisements, see *supra* pp. 10-11; modifies and disables the controls of web browser software applications, see *supra* p. 11; and collects MySpace users' PII.  *See supra* pp. 6-8.  Despite participating in and assisting these activities, Rines failed to secure the required surety bond or to provide that bond to the Commission.  Indeed, Rines admitted last year that he had not obtained the bond.  PX22, Rines Dep. at 108:4-7; PX24, Rines Rep. at 1-2.  Moreover, the FTC has no record of receiving a copy of the required bond from the defendant.  PX32, Burton Decl. at 4 ¶¶ 13-15.  Rines' failure to secure the required performance bond constitutes another blatant violation of the Permanent Injunction.

### C.     The Contempt Defendants Should Be Ordered to Disgorge the Proceeds of their Online Advertising Scheme.

In view of the substantial evidence that the contempt defendants have violated numerous, specific provisions of this Court's Permanent Injunction in their online advertising scheme, the contempt defendants should be held in civil contempt and ordered to disgorge the proceeds of their scheme.  Civil contempt sanctions may be imposed to coerce compliance with a court order and to compensate for the harm sustained as a result of contemptuous acts.  *See In re Power Recovery Sys.*, 950 F.2d at 802; *G&C Merriam Co. v. Webster Dictionary Co.*, 639 F.2d 29, 34-35 (1st Cir. 1980).  The proposed civil contempt order would require the contempt defendants to pay disgorgement for the harms caused as a result of their contemptuous acts.  The district court has the equitable authority to order disgorgement in a contempt case.  *See Leman v. Krentler-Arnold Hinge Last Co.*, 284 U.S. 448, 455-57 (1932); *Tom James Co. v. Morgan*, 141 Fed. App'x 894, 899 (11th Cir. 2005); *Manhattan Indus., Inc. v. Sweater Bee*, 885 F.2d 1, 5-6 (2d Cir. 1989) (citing *Leman*, 284 U.S. at 455-57); *see also Brine Inc. v. STX, LLC*, 367 F. Supp. 2d 61,

70-71 (D. Mass. 2005) (awarding gross profits), *aff'd*, 139 Fed. App'x 281 (Fed. Cir. 2005) (per curiam); *Neiswonger*, 494 F. Supp. 2d at 1082 n.20.

A precise calculation of the amount of harm that the contempt defendants have caused many MySpace users with their phishing, pagejacking, and mousetrapping exploits is difficult to achieve because the contempt defendants' records do not appear to specifically identify the users targeted with those tactics.[18]   In such circumstances, it is appropriate to disgorge all of the money that the contempt defendants received from their scheme.   "[W]here a "harm" amount is difficult to calculate, a court is wholly justified in requiring the party in contempt to disgorge any profits it may have received that resulted in whole or in part from the contemptuous conduct."   *In re General Motors Corp.*, 110 F.3d 1003, 1019 n.16 (4th Cir. 1997); *see SEC v. Patel*, 61 F.3d 137, 140 (2d Cir. 1995) (stating, in calculating disgorgement amount, "any risk of uncertainty should fall on the wrongdoer whose illegal conduct created that uncertainty"); 17 C.J.S. *Contempt* § 115 (2007).   Moreover, an order of disgorgement should be entered against the contempt defendants jointly and severally since each of them is responsible for repeated violations of the Court's Order.   *NLRB v. AFL-CIO*, 882 F.2d 949, 955 (5th Cir. 1989) (holding that, where parties join together to evade an order, they are jointly and severally liable for resulting damages) (citing *Vuitton et Fils S.A. v. Carousel Handbags*, 592 F.2d 126 (2d Cir. 1979)).   Disgorgement is an appropriate and narrowly-tailored remedy for the contempt defendants' contumacious behavior.

---

[18]      As previously discussed, defendant Rines maintained a spreadsheet relating to the contempt defendants' scheme.  *See supra* pp. 13 n.11.  Among other things, this spreadsheet identifies the daily number of users who viewed particular online advertisements.  PX22, Rines Dep. at 44:20-45:19 (explaining spreadsheet entry showing that contempt defendants earned $32.01 for directing 32,365 unique visitors to one particular online advertisement in one day). However, the spreadsheet does not identify the specific users who were redirected and subjected to the contempt defendants' various online advertisements.  *See* PX25, Fin. Spreadsheet *passim*.

**D.    The Court May Enter the Proposed Contempt Order Based on the Testimony, Declarations, and Documentary Evidence if the Contempt Defendants Fail to Raise A Genuine Issue Of Material Fact for Hearing.**

The law of this circuit holds that "a party has a right to an evidentiary hearing in a civil contempt proceeding only if, and to the extent that, genuine issues of material fact exist." *Goya Foods, Inc.*, 290 F.3d at 77 (citing and summarizing *Morales-Feliciano v. Parole Bd.*, 887 F.2d 1, 6-7 (1st Cir. 1989)).  Just as any civil case may be decided on the basis of written testimony upon a motion for summary judgment, "[a] trial court may in a contempt proceeding narrow the issues by requiring that affidavits on file be controverted by counter-affidavits and may thereafter treat as true the facts set forth in uncontroverted affidavits." *Hoffman v. Beer Drivers & Salesmen's Local Union*, 536 F.2d 1268, 1277 (9th Cir. 1976); *see also FTC v. Kuykendall*, 371 F.3d 745, 756 (10th Cir. 2004) (observing that courts may proceed in "more summary fashion" in civil contempt proceedings than in independent civil actions).  There is no need for an evidentiary hearing in civil contempt proceedings where no relevant facts are in dispute. *Goya Foods, Inc.*, 290 F.3d at 77; *D. Patrick, Inc. v. Ford Motor Co.*, 8 F.3d 455, 459 (7th Cir. 1993); *FTC v. Case Equip. Co.*, 821 F. Supp. 790, 791 (D. Me. 1993).

The Commission has no objection to oral argument or a hearing on its motion.  Indeed, if one or more of the contempt defendants present competent affidavits and evidence raising a genuine issue of material fact concerning whether they are liable for contempt, the Court should schedule a hearing to take testimony relevant to the issue(s) raised. *Goya Foods, Inc.*, 290 F.3d at 77.  However, unless the contempt defendants present such evidence, the Court may decide whether Rines, Wallace, and OTM are in contempt based upon the testimony, declarations, and other exhibits submitted with this memorandum, which provide ample evidence of the contempt defendants' contemptuous conduct.  An evidentiary hearing is not necessary where the facts

27

surrounding the contempt are undisputed and cannot be further elucidated by evidence.  *See, e.g.*, *Morales-Feliciano*, 887 F.2d at 6-7.

## V.     Conclusion

Shortly after the Court entered its Permanent Injunction in this case, defendant Rines joined contempt defendants Wallace and OTM in implementing a pernicious online advertising scheme, targeting MySpace users with phishing, pagejacking, and mousetrapping exploits to drive thousands of users to the contempt defendants' advertising websites in violation of the Court's Order.  The contempt defendants enriched themselves in this scheme despite having notice of the Order.  Consequently, the FTC respectfully requests that this Court hold Rines, Wallace, and OTM in civil contempt, disgorge the proceeds of their scheme, and issue all relief appropriate in light of the contempt defendants' numerous violations of the Permanent Injunction.

Respectfully submitted,

WILLIAM BLUMENTHAL
General Counsel


Date:   January 23, 2008

_____/s/ Joshua S. Millard_____
Joshua S. Millard (Bar No. 17183 D. Md.)
Carolyn L. Hann (Bar No. 485953 D.C.)*
FEDERAL TRADE COMMISSION
Bureau of Consumer Protection
Division of Enforcement
600 Pennsylvania Ave., N.W.
Suite NJ-2122
Washington, DC 20580
202.326.2454 (vox) / 202.326.2745 (vox)
202.326.2558 (fax) / 202.326.2559 (fax)
jmillard@ftc.gov / chann@ftc.gov

Attorneys for Plaintiff

*  Mr. Millard and Ms. Hann are attorneys employed by the U.S. Federal Trade Commission. They are in good standing as members of the bar in every jurisdiction in which they are admitted to practice and are not subject to pending disciplinary proceedings.  Each is a member of the bar of a United States District Court and they both appear in this matter consistent with LR 83.2(a).