UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE

<u>Federal Trade Commission</u>,
    Plaintiff

    v.                                  Civil No. 05-cv-330-SM
                                        Opinion No. 2008 DNH 181
<u>Odysseus Marketing, Inc.,</u>
<u>and Walter W. Rines</u>,
    Defendants

**O R D E R**

The Federal Trade Commission seeks to have Walter Rines, Online Turbo Merchant, Inc. ("OTM"), and Sanford Wallace, held in civil contempt for violating a stipulated final order for permanent injunction entered in this case on October 24, 2006. Although neither OTM nor Sanford Wallace was a party to this suit, the government charges that they had notice of the injunction and were "in active concert or participation with" Rines in violating its terms.  <u>See</u> Fed. R. Civ. P. 65(d)(2).

**Background**

Rines and Wallace were in the business of generating Internet advertising revenue, by maintaining websites open to Internet traffic at which advertisers could tout their products and services to visitors.  Rines says (by deposition admitted by agreement) that his part of the business related to maintaining servers for Wallace's use, maintaining and managing affiliate

websites, obtaining advertisers, and managing the accounts (Rines and Wallace were paid a fee by advertisers based upon the number of visits to the sites carrying their ads). Wallace, on the other hand, was responsible for generating Internet traffic to those sites — much like a hawker standing outside a bar inviting passers-by to enter, albeit in a technologically more sophisticated way.

Wallace did more, however, than just invite Internet surfers to visit the pertinent websites. In a typical scheme, he created thousands of MySpace accounts (MySpace is an Internet social networking site) and used those accounts to send out multiple thousands of messages to MySpace users that were deceptive. To a recipient, the message would appear to be from a "friend" and it encouraged the recipient to watch an interesting video, ostensibly included with the message, using what looked like an Internet video player. In fact, there was no video, and the "video player" was merely a link to one of the websites managed or maintained by Rines and Wallace. If the recipient clicked on the "player," and many did so, he or she did not see a video, but rather was immediately redirected from the MySpace site (and its servers) to a website operated by Rines — that is, a site other than the one he or she chose to visit. Once at the new site, the recipient would be invited to provide his or her MySpace login

and password to access some service or product or information — a practice commonly known as "phishing." Other similar ploys were used to redirect users to the websites maintained by Rines.

So, Wallace's schemes, in simple terms, included downloading content (the message, "video player," and redirecting link) to a user of a covered product (a computer), without the user's express prior consent; the downloaded content redirected the user's covered product to different websites, pages, and Internet servers (from the MySpace site and servers to those maintained by Rines) other than those the product's user chose to visit; and personally identifiable information from users was obtained — all without their prior consent.

## Discussion

Rines has interposed a defense, essentially contending that while he and Wallace had a business relationship — an oral contractual agreement — it was Wallace, not Rines, who was contractually responsible for directing Internet traffic to various websites managed or maintained by Rines.

Those websites, of course, generated revenue for Rines and Wallace based upon the volume of Internet traffic received at those sites. Rines says he was neither involved in, nor

responsible for, directing Internet traffic to the sites, and did not engage in that activity.  He says his responsibility extended only to maintaining the websites, arranging for advertising, and accounting for business expenses and revenues.

Moreover, Rines says Wallace was duty bound under their agreement to not only conduct his activities in strict compliance with applicable law, but also in compliance with the terms of the October 27 injunction.  That is, Rines says Wallace, to the extent his activity was prohibited by the terms of the injunction, acted on his own, and was not "in active concert or participation with" Rines.  (Rines also implausibly suggests, in passing, that Wallace's activities did not literally run afoul of the injunction's terms.)

The Injunction

Wallace and Rines had actual prior knowledge of the injunction and its specific terms.  That is not disputed.  The government alleges that Wallace and Rines (and his now defunct company, OTM) violated Sections II A., II B.1, II B.2, IV A, and IX of the injunction, which provide:

> II.  IT IS FURTHER ORDERED that Defendants, whether acting directly or through any person, corporation, subsidiary, division, or other device, and their offices, agents, directors, employees, salespersons, independent contractors, affiliates, successors,

4

assigns, and all other persons or entities <u>in active concert or participation with any of them</u> who receive actual notice of this Order by personal service or otherwise, are hereby enjoined from, or assisting others in:

   A.   Distributing, installing, or downloading, or causing any user of a covered product to download or install, any software program, code, script, or any other content *unless* such user provides express consent as defined in this order prior to the distribution, installation, or downloading; and

   B.   Distributing, installing, or downloading, or causing any user of a covered product to download or install, any software program, code, script, <u>or any other content</u> that:

      1.   Redirects any covered product that is converted to the Internet or World Wide Web to different websites, web pages, FTP servers, or other Internet servers than those the product's user chose to visit;

      2.   Modifies or replaces any search engine's or other application's search results, search features, or junction; . . . .

IV. [same preamble as II]

   A.   Obtaining any personally identifiable information of any person *unless* that person provides express consent as defined in this Order prior to taking and use of the information.

IX.

   A.   Defendant Rines, whether directly, or in concert with other, or through any business, entity, corporation, subsidiary, division, or other device, in which he has a direct or indirect ownership interest or controlling interest, or for which he holds a managerial post or serves as an officer, director, consultant, or employee is hereby permanently enjoined and restrained from participating [in], or assisting others, in any manner whatsoever, in the downloading or

>           installation of any software program, code,
>           script, or other content that:
>
>           1.   Causes the display of any advertisement;
>
>           2.   Modifies any web browser or operating
>                system software; or
>
>           3.   Collects any personal, identifiable
>                information, unless he first obtains a
>                surety bond in the principal sum of Five
>                Hundred Thousand Dollars ($500,000) [or
>                posts equivalent cash or letter of
>                credit in escrow].

(emphasis supplied)

The parties to this suit (the government and Rines) appeared at a hearing on the motion and presented evidence, testimony, and proffers.  Based upon the developed record, the court finds that Wallace engaged in conduct that plainly ran afoul of Sections II A, II B.1, and IV A.  But a question remains with regard to the extent to which he may be held in civil contempt for that activity.

Active Concert or Participation

The government faces two related difficulties in this case. First, there is a problem of proof; second, a problem well-explained by Judge Hand in 1930:

> We agree that a person who knowingly assists a
> defendant in violating an injunction subjects himself
> to civil as well as criminal proceedings for contempt.
> This is well settled law.  On the other hand no court
> can make a decree which will bind any one but a party;

> a court of equity is as much so limited as a court of
> law; it cannot lawfully enjoin the world at large, no
> matter how broadly it words its decree.
>
> \*   \*   \*
>
> Thus, the only occasion when a person not a party maybe
> punished, is when he has helped to bring about, not
> merely what the decree has forbidden, because it may
> have gone too far, but what it has power to forbid, an
> act of a party.  This means that the respondent must
> either abet the defendant, or must be legally
> identified with him.
>
> \*   \*   \*
>
> Thus, if the defendant is not involved in the contempt,
> the employee cannot be; the decree has not been
> disobeyed, so far as it is valid.  We may assume for
> argument that it is not necessary for the defendant
> expressly to authorize the act; that it is enough if
> the employee acts within the scope of his authority.
> But that does not affect the principle; rather it
> illustrates it, since the authority of an agent need
> never be express.

<u>Alemite Mfg. Corporation v. Staff</u>, 42 F.2d 832, 832-33 (2d Cir. 1930) (citations omitted); <u>see also</u> <u>United Pharmacal Corp. v. United States</u>, 306 F.2d 515 (1st Cir. 1962).

<u>Section II</u>

Here, the government has established that Wallace acted in a manner that brought about that which the decree has forbidden. But it has not adequately established that Wallace brought about that which the decree has the power to forbid — an act of a party (Rines).  The government loosely charges Wallace with being in "active concert or participation with" Rines, but argues not so

7

much that Wallace abetted Rines but, rather, that Rines abetted Wallace, or that Rines directed Wallace, or that Rines and Wallace were in it together, or, perhaps, that Rines knew that Wallace was engaged in conduct which violated the injunction's terms, but either ignored or willfully turned a blind eye to it. While it is undeniable that Rines benefitted from Wallace's activity (the advertising fees were shared between them), the record, as developed, contains insufficient evidence to establish that Rines abetted, directed, controlled, or even encouraged the particular schemes Wallace employed to steer Internet traffic to the websites maintained by Rines.  At least, there is insufficient evidence to establish Rines' involvement in that activity by clear and convincing evidence, as is required.

Courts have understood the phrase in "active concert or participation with" as requiring that a person either be "legally identified with" the party targeted by the injunction or "aid and abet" a targeted party to violate the injunction.  NBA Properties, Inc. v. Gold, 895 F.2d 30, 33 (1st Cir. 1990).

The record, as developed, is insufficient to establish that Wallace was "legally identified" with Rines.  What little that can be found on the point is contrary.  Rines formed and owned OTM.  In his deposition Rines says that he and OTM contracted

with Wallace to perform a steering function.  Wallace handled traffic generation, not Rines.  Rines made servers available for Wallace's use, and provided other support, but there is little evidence to establish that Rines held any power of direction or control over Wallace's activities.  See, e.g., Project B.A.S.I.C. v. Kemp, et al., 947 F.2d 11, 20 (1st Cir. 1991).  As it stands, the record discloses a contractual relationship between Rines (OTM) and Wallace, not an employment relationship.

Similarly, there is scant evidence tending to establish that Wallace abetted Rines' violation of the injunction.  Rines himself says he told Wallace that, as part of the arrangement between them, Wallace was obliged to conduct his activity in a manner consistent with the law and, specifically, the injunction.  For his part, Wallace (in his proffered deposition) does not suggest that Rines played any role in his traffic-generating activities and, indeed, professes the view, however, implausibly, that his own activities were not violative of the injunction's provisions.

Now, to be sure, Rines' defense — "I told Wallace to comply with the injunction" — calls to mind Captain Louis Renault's memorable line in Casablanca ("I'm shocked, shocked to find that gambling is going on here!").  The government's instinct is on

solid footing — there is good reason to speculate, if not "know", that Wallace and Rines were engaged in a joint venture; that this nefarious scheme was little different from the last one they perpetrated together; that each knew full well what was being done to generate revenue-producing traffic to the affiliated websites; and that they both knew that the activities violated the injunction.  But, as is sometimes the case, what one suspects, assumes, and "knows" to be the case has simply not been proven to the requisite standard.  That is the case here.  I decline to infer, based upon the mere relationship and the activity itself, that, clearly and convincingly, Rines was in active concert or participation with Wallace with respect to the particular redirecting schemes perpetrated.  A different result would likely obtain on a lower, preponderance standard of proof, or if some, more persuasive, evidence of knowledge, action, etc., had been produced.

Section IV

Once Internet users were redirected to the websites maintained by Rines, they were generally exposed to a "phishing" operation — that is, they were asked to provide log in and password information related to their MySpace account, which Rines collected and Wallace then used to send even more messages, posing as the duped user (i.e., using the MySpace accounts of the

persons who provided the personally identifiable information). Needless to say, express consent was not obtained from the redirected users before the information was "taken and use[d]." Plainly, that activity was in violation of Section IV's clear terms, and Wallace was in active concert or participation with Rines with regard to that activity.  Rines cannot plausibly suggest that he was ignorant of the activity occurring on the websites he maintained (where the phishing occurred), and Wallace can hardly be heard to suggest that he was unaware of the phishing operation that generated information (i.e., the user names and login passwords) he then put to use in continuing and expanding the redirection operation.

Section IX

     Rines was, specifically and in clear terms, prohibited from "participating, or assisting others, in any manner whatsoever in the downloading or installation of any software program, code, script, or other content that:  1. Causes the display of any advertisement; . . . [or] 3. Collects any personally identifiable information unless he first obtains a surety bond in the principal sum of Five Hundred Thousand Dollars ($500,000)."  The record discloses that Rines never posted the required bond.

Through his business entity (OTM) and personally, Rines downloaded content, code, and software programs that caused the display of advertisement on the websites he maintained (the very point of the business operation was to generate advertising revenue by exposing redirected Internet users and others to the advertising displayed on the affiliate sites).  Rines and Wallace realized over $500,000 in revenue from the operation.  In so doing, however, Rines violated the express prohibitions set forth in Section IX of the permanent injunction by engaging in that conduct without posting the required bond.

**Conclusion**

For the reasons given, the court finds the evidence insufficient to establish clearly and convincingly that Wallace was in active concert with or aided or abetted Rines in violating the terms of Sections II A (Rines was not shown to have abetted Wallace in downloading content related to redirection); II B.1; or II B.2. (Wallace's scheme did not modify or replace a user's search engine's features, functions, or search results) of the permanent injunction.  However, Wallace was in active concert with Rines, and aided and abetted Rines in his violation of the terms of Section IV A.  Additionally, Rines violated Section IX of the permanent injunction.  Wallace, Rines, and OTM are adjudged to be in civil contempt.  As provided in a

contemporaneous order, Wallace, Rines and OTM shall pay, jointly and severally, for the harm caused by their contemptuous conduct, $555,840.04, representing disgorgement of the revenue obtained as a direct result of their violations.  However, to the extent they or any of them disgorge part or all of that amount in the context of any other civil suit, enforcement action, or proceeding, they will be proportionately relieved of that obligation.  Plaintiff's motion for contempt (document no. 27) is granted in part and denied in part.

    **SO ORDERED.**

_____
Steven J. McAuliffe
Chief Judge

September 30, 2008

cc:   Joshua S. Millard, Esq.
      Frank M. Gorman, Esq.
      Peter V. Doyle, Esq.